UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JASON NIEMAN, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:14-CV-3897-M (BF) |
| | § | |
| CITY OF DALLAS, et al., | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

This case has been referred to the United States Magistrate Judge for pretrial management.

On July 30, 2015, the undersigned entered Amended Findings, Conclusions and Recommendation

[D.E. 125] recommending that the District Court grant the Motion to Dismiss [D.E. 28] filed by

Defendants Ellen O'Connell, M.D., Alexander Eastman, M.D., Gina Cho, M.D., Jeffrey Pruitt, M.D.,

Nhan Le, M.D., Kyle Molberg, M.D., Suhny Abbara, M.D., and Anthony Whittemore, M.D.

("Defendants"). On July 31, 2015, Plaintiff Jason Nieman ("Plaintiff") filed his objections [D.E.

128]. On August 7, 2015, Defendants filed their response to Plaintiff's objections [D.E. 133]. On

August 28, 2015, the District Court entered its Order Remanding Amended Findings, Conclusions

and Recommendation of the United States Magistrate Judge for Further Consideration in Light of

Objections [D.E. 158]. Specifically, the District Court remanded the Amended Findings,

Conclusions and Recommendation [D.E. 125] for further consideration in light of a case cited by

Plaintiff in his objections, *George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014). Upon further

consideration of *George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014) and Defendants' Motion to

Dismiss [D.E. 28], the undersigned respectfully recommends that the Court **OVERRULE** Plaintiff's

objections [D.E. 128] and adopt the undersigned's Amended Findings, Conclusions and

Recommendation [D.E. 125] recommending that the District Court **GRANT** Defendants' Motion

to Dismiss [D.E. 28].

### Background

Plaintiff Jason Nieman ("Plaintiff") brings this suit alleging personal injury and violations

of his civil rights under Title 42, United States Code, Section 1983 ("Section 1983") in connection

with events that took place on September 14, 2014 at Concrete Cowboy located on Cedar Springs

Road in Dallas, Texas. *See* Am. Compl. [D.E. 16 at 24]. On that night, Plaintiff contends that he

consumed 4 glasses of wine with dinner between 6:00 p.m. and 9:00 p.m. at a restaurant located at

the Adolphus Hotel, but that he was not intoxicated when he left the restaurant. *See id.* [D.E. 16 at

24]. Plaintiff states that at approximately 9:00 p.m., he went to a nearby venue, OE Penguin in search

of a karaoke bar, but upon discovering that there was no karaoke at that location, Plaintiff proceeded

to the Concrete Cowboy with an individual named "Jason" and an unidentified female companion.

*See id.* [D.E. 16 at 24]. Plaintiff states that does not recall consuming any alcoholic beverages at OE

Penguin. *See id.* [D.E. 16 at 24].

Plaintiff states that upon arriving at Concrete Cowboy, he consumed a beverage given to him

by Jason which he believed to be vodka and Red Bull, but was contaminated with a drug appearing

to have been Gamma Hydroxybutyrate ("GHB") or Rohypnol. *See id.* [D.E. 16 at 24-25]. Within few

minutes of consuming the contaminated beverage, Plaintiff contends that his judgment, physical

control and memory were greatly compromised but alleges that the staff at Concrete Cowboy and

police officers failed to reasonably prevent and/or detect the "drugging incident," and the staff at

Concrete Cowboy allowed Plaintiff to be provided more alcoholic beverages despite his obviously

compromised condition. *See id.* [D.E. 16 at 25]. Plaintiff contends that shortly after, he was

attempting to "escape the clutches" of Jason and his unidentified female companion when he fell on a staircase at Concrete Cowboy which he believes was caused by the combination of: (1) the consumption of the contaminated beverage; (2) the defective and/or dangerous condition of the staircase and/or handrail; and (3) inadequate lighting in the staircase. *See id.* [D.E. 16 at 25-26]. Plaintiff contends that he "suffered a hard fall with a serious facial/cranial impact." *See id.* [D.E. 16 at 26]. Plaintiff states that as a result of his fall, he "suffered a deep abrasion/laceration to his nose, a serious nasal contusion, [and a] non-serious concussion." *See id.* [D.E. 16 at 26].

Plaintiff contends that he encountered the owner of Concrete Cowboy and two Dallas police officers shortly after mid-night, all of whom, despite the fact that they "could see that Plaintiff [] was impaired" and "could see that [he] had suffered at least a moderately serious facial/head injury and were advised that such injuries were the result of a fall on the premises, . . . . simply allowed [him] to walk on, despite his obviously compromised state." *See id.* [D.E. 16 at 26]. Plaintiff alleges that at approximately 12:45 a.m. on September 15, 2014, paramedics Dwaine N. Helton and Michael Milam captured and kidnapped him using unreasonable physical force and transported him to Parkland. *See id.* [D.E. 16 at 26]. Plaintiff contends that as "a reasonable person trying to free himself from unlawful and/or unreasonable restraint, battery, and/or detention, Plaintiff struggled and growled/yelled, demanding to be released." *See id.* [D.E. 16 at 27]. Plaintiff further states that his "yells were such that some saliva unintentionally escaped his mouth as he made his pleas," but that he never attempted "to bite or injure Defendants Helton, Milam, or anyone else." *See id.* [D.E. 16 at 27]. Furthermore, Plaintiff alleges that Defendant Jessica L. Morrell, a City of Dallas law enforcement officer violated her duty to prevent the paramedics from kidnapping Plaintiff against his will and transporting him to Parkland. *See id.* [D.E. 16 at 28]. Furthermore, Plaintiff alleges that

3

Officer Morell later created a Apprehension by a Peace Officer Without Warrant ("APOWW") form to make it appear that Plaintiff's capture, imprisonment and battery were lawful. *See id.* [D.E. 16 at 28].

Plaintiff alleges that in the early morning of September 15, 2014, he was held captive at Parkland and that the staff at Parkland, without his consent, "cut off his clothes, destroying his shirt, pants, and underwear, and stole his wallet, money, identification, credit cards, insurance cards, cellular phone, and related items from him by way of strong arm robbery and/or robbery [b]y virtue of restrain and/or medication." *See id.* [D.E. 16 at 29-30]. However, Plaintiff states that by approximately 1:45 p.m. of that same day, his clothing, wallet and telephone were returned to him and he was released from Parkland. *See id.* [D.E. 16 at 34]. Plaintiff alleges that he was subjected to numerous unauthorized procedures and treatments during his transportation to and during his stay at Parkland. *See id.* [D.E. 16 at 27-34]. Plaintiff further contends that "[a]t no time did [he] give any relevant Defendant consent for treatment or billing, nor did he ever consent to this outrageous intrusion as to his personal privacy." *See id.* [D.E. 16 at 30].

On January 23, 2015, Defendants filed their motion to dismiss. *See* Defs.' Mot. [D.E. 28]. Defendants argued that Plaintiff's Texas Tort Claims Act ("TTCA") claim is barred under Texas Civil Practice and Remedies Code, Section 101.106(e) which precludes Plaintiff from filing a suit against both a governmental unit and its employees. *See* Defs.' Br. [D.E. 29 at 17-19]. Further, Defendants argued that Plaintiff failed to allege a constitutional violation necessary to state a Section 1983 claim. *See id.* [D.E. 29 at 24-28]. Plaintiff filed his response on January 26, 2015 arguing that he alleged viable claims against Defendants. *See* Resp. [D.E. 38].

4

### *George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014)

*George v. Edholm* involved a case where Clifford George ("George") was searched for narcotics retrieved from his rectum. *George v. Edholm*, 752 F.3d 1206, 1209 (9th Cir. 2014). George was arrested for violating his parole by living in an apartment with a firearm. *Id.* During a subsequent strip search, a police officer, Greg Freeman ("Officer Freeman") believed that George feigned a seizure in order to conceal narcotics. *Id.* Officer Freeman testified in his deposition that he did not believe George was having a seizure, because it appeared to him that he was attempting to conceal narcotics which were later recovered from his rectum. *Id.* George testified at his deposition that Officer Freeman told the paramedics that George swallowed something and stuck something in his rectum and that they needed to retrieve it. *Id.* at 1210. Officer Freeman testified that he informed the paramedics that George possibly had a seizure and that they needed to get him cleared medically for booking. *Id.* Officer Freeman further testified that the paramedics took George to the hospital "to save his life." *Id.* Another police officer, Daryll Johnson ("Officer Johnson") testified that he did not believe there was anything wrong with George when he was taken to the hospital, and that he and another officer took George to the hospital in a police vehicle. *Id.* The hospital records indicated that the police officers took George to the hospital and that George was in police custody when he arrived. *Id.* Hospital records also indicated that the police told intake personnel that George had swallowed cocaine, put cocaine in his rectum, and possibly had a seizure. *Id.* at 1211.

Dr. Thomas Edholm ("Dr. Edholm"), an emergency-room physician signed a discharge report at George's release stating that George had a blood pressure of 180/115, a pulse of 120, a respiratory rate of 18, and a temperature of 98. *Id.* Dr. Edholm testified at his deposition that those numbers were "severely high" and were "consistent with cocaine toxicity." *Id.* Dr. Edholm had removed the

cocaine baggie from George's rectum with long forceps, and George was given one gallon of liquid laxatives to flush out his system. *Id.* at 1213. Subsequent testing revealed that the intact plastic baggie removed from George's rectum contained about 8.99 grams of cocaine base. *Id.* Dr. Edholm testified that his treatment of George was based on the information he received from the police and the nurses, and the physical evidence of cocaine toxicity which led him to believe that George's life was in danger. *Id.* Dr. Edholm acknowledged at his deposition that the procedures he performed required patient consent, but that he acted without George's compliance. *Id.* Dr. Edholm testified that as an emergency doctor, he does not routinely seek patient consent and believed that the admissions staff was responsible for obtaining patient consent. *Id.*

George was charged with possession of cocaine base for sale in violation of California Health and Safety Code, Section 11351.5 to which he pled no contest and was sentenced to an eight-year prison term. *Id.* George then brought a Section 1983 suit against Officer Freeman, Officer Johnson, Dr. Edholm, and two nurses. *Id.* George alleged violations of his Fourth and Fourteenth Amendment rights based on his initial detention, the search of his apartment and his treatment at the hospital. *Id.* The district court granted summary judgment in favor of Officer Freeman and Officer Johnson (collectively, the "Officers"), and dismissed with prejudice George's claims against Dr. Edholm and the nurses because they were not served. *Id.* On appeal, the Ninth Circuit affirmed summary judgment as to George's claim arising out of his initial detention and the summary judgment in favor of the nurses. *Id.* at 1214. The Ninth Circuit reversed and remanded as to George's remaining claims. *Id.* The Ninth Circuit determined that George should have been allowed to withdraw his deemed admissions during discovery and that his sworn complaint should have served as an affidavit, and ordered the district court to permit George to perfect service as to Dr. Edholm. *Id.* On remand,

George served his complaint on Dr. Edholm. *Id.* Dr. Edholm failed to answer. *Id.* After limited discovery, the Officers again moved for summary judgment and the district court granted their motion. *Id.* The Ninth Circuit indicated that the district court believed that this ruling, if correct, resolved George's claims against Dr. Edholm. *Id.* In order to take care of the "technicality" of Dr. Edholm's failure to appear, the district court recommended that George voluntarily dismiss Dr. Edholm without prejudice. *Id.* Before George filed his voluntary dismissal, however, the district court entered a final judgment dismissing George's complaint in its entirety, and George filed his voluntary dismissal as to Dr. Edholm the next day. *Id.* George then timely appealed, but only appealed the grant of summary judgment on his claims arising out of his treatment at the hospital. *Id.*

George claimed that the conduct of the Officers and the treatment administered by Dr. Edholm violated his Fourth Amendment right to be free from an unreasonable search and his Fourteenth Amendment right to refuse medical treatment. *Id.* The district court granted summary judgment as to the Officers on the ground that Dr. Edholm acted as a private citizen whose conduct could not be imputed to the Officers. *Id.* at 1214-15. The district court further held that even if the Officers violated George's constitutional rights, they were entitled to qualified immunity. *Id.* at 1215. However, the Ninth Circuit disagreed with the district court's holding that Dr. Edholm's conduct could not be attributed to the state as a matter of law. *Id.* The Ninth Circuit held that the Officers could be held responsible for procedures performed by Dr. Edholm and that there was evidence in the record that would support a finding that the Officers violated George's Fourth Amendment rights. *Id.* at 1217. The Ninth Circuit considered that: (1) the danger to George's health and safety from the procedures performed at the hospital appeared to have been slight; (2) George testified that

the anoscopy performed caused him severe pain and bleeding that continued after he left the hospital; (3) the intrusion upon George's dignitary interests in bodily integrity and personal privacy was extreme; (4) George did not consent to any of the procedures; (5) the officers did not have a warrant for the procedures performed nor attempted to obtain one; (6) the procedures were highly humiliating and intrusive; and (7) the search was at least as invasive as searches that the Ninth Circuit and other courts have characterized as unwarranted intrusions on dignitary interests. *Id.* at 1217-18.

The Ninth Circuit noted that "[i]ntrusive body searches are permissible when they are reasonably necessary to respond to an immediate medical emergency." *Id.* at 1219 (citing *United States v. Husband*, 226 F.3d 626, 635 (7th Cir. 2000); *People v. Bracamonte*, 540 P.2d 624, 629 (1975)). While the Officers argued that such an emergency existed due to the fact that the baggie of cocaine in George's rectum could have ruptured, because George would have been responsible for any such resulting medical risk, the Ninth Circuit stated that only a showing of the greatest imminent harm would justify the intrusive actions taken to remove the baggie from George's rectum. *Id.* (quoting *United States v. Cameron*, 538 F.2d 254, 259 n.8 (9th Cir. 1976)). While the Officers relied heavily on Dr. Edholm's testimony that the procedures were a "life-saving treatment," the Ninth Circuit determined that Dr. Edholm's testimony would be of limited use if the jury concluded that the Officers were the source of false information that caused Dr. Edholm to believe that a life-threatening emergency existed. *Id.* The Ninth Circuit observed that Dr. Edholm never testified that he believed the plastic baggie had actually ruptured, only that if a plastic baggie containing a golf ball size amount of cocaine ruptured in George's rectum, he would likely have died that evening. *Id.*

The Ninth Circuit determined that a reasonable jury could conclude that the only actual risk to George's health was the possibility of the baggie rupturing and "[t]hat sort of speculative,

generalized risk cannot, on its own, justify nonconsensual procedures as invasive as those performed by Dr. Edholm." *Id.* Otherwise, the Ninth Circuit noted that such "highly invasive searches of drug-packing suspects' rectums would never violate the Fourth Amendment." *Id.* The Ninth Circuit determined that the record could support a jury conclusion that the search was not reasonably necessary to address the risk of the baggie rupturing in George's rectum, because the Officers both testified that they have seen doctors allow suspects with drugs in their rectums to pass the drugs naturally, including a suspect who was placed in intensive care because he had a very high heart rate. *Id.* Therefore, the Ninth Circuit concluded that a rational jury could determine that the potential risk of the baggie rupturing could be sufficiently addressed by monitoring George's bowel movements at the hospital and that the drug filled baggie could have been recovered through a far less intrusive method. *Id.* (citing *United States v. Aman*, 624 F.2d 911, 913 (9th Cir. 1980)). The Ninth Circuit determined that if George's life was not in immediate jeopardy, doctors could have kept him at the hospital, administered laxatives, monitored his bowel movements, and if the course of treatment was followed, the Officers could have had time to seek a search warrant. *Id.* at 1220 (citing *Cameron*, 538 F.2d at 259; *United States v. Erwin*, 625 F.2d 838, 841 (9th Cir. 1980)). Therefore, the Ninth Circuit concluded that the intrusiveness of the search far exceeded what was necessary to serve the community's interest in recovering evidence of George's crime and that the procedures performed by Dr. Edholm violated the Fourth Amendment. *Id.*

In addition, the Ninth Circuit determined that qualified immunity does not preclude George's Fourth Amendment claim against the Officers because George provided evidence that would support a jury conclusion that: (1) the Officers gave false information to Dr. Edholm; (2) the false information caused Dr. Edholm to perform unconstitutionally intrusive procedures that he would not

otherwise have performed; (3) no reasonable officer could have believed that he could avoid responsibility for an unconstitutional search by using deception to induce a private party to perform a search; and (4) it was clearly established that the methods used to search a suspect's body must be reasonable. *Id.* at 1221. The Ninth Circuit did not reach George's Fourteenth Amendment claim based on his right to refuse unwanted medical treatment, because it held that the Officers were entitled to qualified immunity. *Id.* The Ninth Circuit noted that George did not identify a single case finding a Fourteenth Amendment violation under similar circumstances and that it was unable to say that "every reasonable official" would have known that the procedures performed by Dr. Edholm violated the Fourteenth Amendment. *Id.*

## Analysis

In his discussion of *George v. Edholm*, Plaintiff states that while "a true medical emergency . . . could, in some cases, permit non-consensual treatment to occur," the circumstances surrounding his admission to Parkland clearly was not a true medical emergency because "shortly after arrival at Parkland, Plaintiff was conscious, reasonably lucid and aware . . . he refused treatment, and asked to be immediately released." *Id.* [D.E. 128 at 5, 13]. Plaintiff argues that similar to the facts in *George v. Edholm*, Defendants should have obtained Plaintiff's consent prior to administering medical treatment because his circumstances did not present an emergency. *Id.* [D.E. 128 at 13]. Defendants, on the other hand, argue in their response that *George v. Edholm* is not applicable because the Ninth Circuit specifically declined to address whether any claims remained against Dr. Edholm given that he was already dismissed, and because *George v. Edholm* does not apply to the claims against Defendants who provided potentially life-saving treatment to an injured patient. *See* Defs.' Resp. [D.E. 133 at 5-6]. Furthermore, Defendants note that the Ninth Circuit in *George v.*

*Edholm* affirmed the trial court's dismissal of George's claim alleging violation of his Fourteenth Amendment right to refuse medical treatment. *Id.* [D.E. 133 at 6].

As previously discussed, Plaintiff alleges the following in his operative complaint:

1. Plaintiff consumed a beverage at Concrete Cowboy that was contaminated with a drug appearing to have been GHB or Rohypnol. *See* Am. Compl. [D.E. 16 at 24-25].

2. Within few minutes of consuming the contaminated beverage, Plaintiff's "judgment, physical control, and memory" were greatly compromised but the staff at Concrete Cowboy failed to prevent or detect the "drugging incident" and allowed Plaintiff to be provided more alcoholic beverages despite his "obviously compromised and/or intoxicated condition." *See id.* [D.E. 16 at 25].

3. Shortly after consuming the contaminated beverage, Plaintiff suffered a hard fall on a staircase at Concrete Cowboy that resulted in a "serious facial/cranial impact." *See id.* [D.E. 16 at 25-26].

5. Plaintiff "suffered a deep abrasion/laceration to his nose, a serious nasal contusion, [and a] non-serious concussion from the fall." *See id.* [D.E. 16 at 26].

6. Shortly after mid-night, Plaintiff encountered the owner of Concrete Cowboy and two Dallas police officers, whom despite Plaintiff's apparent compromised state and serious facial/head injuries and being advised by Plaintiff of his fall, allowed Plaintiff to walk away from the premises. *See id.* [D.E. 16 at 26].

7. At approximately 12:45 a.m., paramedics Dwaine N. Helton and Michael Milam captured and kidnapped Plaintiff using unreasonable physical force and transported him to Parkland. *See id.* [D.E. 16 at 26-27].

8. As "a reasonable person trying to free himself from unlawful and/or unreasonable restraint, battery, and/or detention, Plaintiff struggled and growled/yelled, demanding to be release." *See id.* [D.E. 16 at 27].

9. Plaintiff's "yells were such that some saliva unintentionally escaped his mouth as he made his pleas," but he never attempted "to bite or injure Defendants Helton, Milam or anyone else." *See id.* [D.E. 16 at 27].

10. Officer Morell filled out a APOWW form in an attempt to disguise the unlawful imprisonment and battery inflicted upon Plaintiff. *See id.* [D.E. 16 at 29].

Therefore, despite sustaining serious, visible head injuries and a concussion, having been drugged with GHB or Rohypnol, consuming multiple alcoholic beverages before and after being

drugged, and exhibiting conduct that included growling and yelling wherein the paramedics appeared to have perceived that Plaintiff was trying to bite them, Plaintiff argues that the medical staff at Parkland should have released him upon arrival because he did not consent to medical treatment. *See id.* [D.E. 16 at 24-29]. The undersigned notes that while Plaintiff alleges that the owner of Concrete Cowboy and the police officers on the scene were at fault for allowing him to walk away despite obvious facial and head injuries, Plaintiff is arguing that medical professionals at Parkland who have been trained to detect symptoms of head trauma and impairments resulting from consumption of drugs should have allowed him to leave the hospital. While Plaintiff argues in his objections that he should have been released because "shortly after arrival at Parkland, [he] was conscious, reasonably lucid and aware," he "had no external signs of serious injury," and he had "nothing more than a possible head injury and some disorientation," Plaintiff states in his operative complaint that his fall resulted in a "serious facial/cranial impact," he "suffered a deep abrasion/laceration to his nose," a "serious nasal contusion," and a concussion. *See id.* [D.E. 16 at 26]; Pl.'s Objections [D.E. 128 at 5-8]. Furthermore, Plaintiff acknowledges in his objections that some of the defendants in this case contend that he was highly intoxicated and violent as evidenced by Defendant Merrell's APOWW. *See* Pl.'s Objections [D.E. 128 at 7].

As previously discussed, the Ninth Circuit noted in *George v. Edelman* that intrusive body searches are permissible when they are reasonably necessary to respond to an immediate medical emergency. *George*, 752 F.3d at 1219 (citing *United States v. Husband*, 226 F.3d 626, 635 (7th Cir. 2000); *People v. Bracamonte*, 540 P.2d 624, 629 (1975)). "The Supreme Court has held that the need to assist persons who are seriously injured or threatened with such injury is an exigency that obviates the need for a warrant." *United States v. Troop*, 514 F.3d 405, 409 (5th Cir. 2008) (citing *Brigham*

12

*City v. Stuart*, 547 U.S. 398, 402 (2006)). The Supreme Court has explained that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Stuart*, 547 U.S. at 403 (citations omitted). In *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1772, 1778 (2015), the Supreme Court reversed the Ninth Circuit's holding that the officers were not entitled to qualified immunity where the Ninth Circuit found "that it was clearly established that an officer cannot 'forcibly enter the home of an armed, mentally ill subject who had been acting irrationally and had threatened anyone who entered when there was no objective need for immediate entry.'" *Sheehan*, 135 S. Ct. at 1772 (quoting *Sheehan v. City of San Franciso*, 743 F.3d 1211, 1229 (9th Cir. 2014)). In its analysis, the Supreme Court in *Sheehan* observed that a notable distinguishing fact of the case before it was "a dangerous, obviously unstable person making threats." *Id.* at 1775-76.

In the case at hand, Plaintiff exhibited conduct and symptoms that made the medical professionals at Parkland question his mental condition. Plaintiff's case is distinguishable from *George v. Edelman* in that, unlike the arrestee in that case, Plaintiff's mental condition was in question due to a concussion and because he was drugged. Plaintiff specifically states in his Amended Complaint that he sustained a concussion, was drugged, and that he "growled/yelled" at the paramedics. *See* Am. Compl. [D.E. 16 at 25-27]. Furthermore, Plaintiff states in his Amended Complaint that his compromised state and facial/head injuries were apparent. *See id.* [D.E. 16 at 26]. In addition, Plaintiff states that an APOWW was issued by an officer for his alleged violent behavior. *See id.* [D.E. 16 at 29]. While Plaintiff may have believed that the medical treatment was not necessary, Defendants who are all physicians contend that they were "providing potentially life-saving treatment to an injured patient." *See* Defs.' Resp. [D.E. 133 at 6]. Therefore, even assuming

13

arguendo that the Defendants' treatment of Plaintiff would otherwise violate Plaintiff's Fourth Amendment rights, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Stuart*, 547 U.S. at 402. Given the facts described in Plaintiff's Amended Complaint regarding his physical condition, Defendants' conduct in providing medical treatment without Plaintiff's consent is deemed reasonable pursuant to the case law discussed.

The facts in this case are further distinguishable from *George v. Edelman* in that the potential harm that was at issue in *George* had already taken place for Plaintiff upon his arrival at Parkland. *See George*, 752 F.3d at 1219. In *George v. Edelman*, the Ninth Circuit determined that the methods used to remove the plastic baggie from George's rectum was too intrusive because there was only a potential that the baggie would burst in his body and the harm would only occur if the drugs entered George's system. *Id.* Therefore, the Ninth Circuit determined that the defendants could have monitored George's body until law enforcement obtained a warrant. *Id.* Here, however, Plaintiff's Amended Complaint states that he ingested the drugs and that his "judgment, physical control, and memory" were already greatly impaired prior to his arrival at Parkland. *See* Am. Compl. [D.E. 16 at 24-26].

Furthermore, a mentally competent person has the right to refuse medical treatment under the Due Process Clause of the Fourteenth Amendment. *Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012) (citing *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990)). In this case, Plaintiff's serious head injuries put into question his ability to competently refuse medical treatment. *See Petway v. City of New York*, No. 02-CV-2715 (NGG) (LB), 2005 WL 2137805, at *13 (E.D.N.Y. Sept. 2, 2005) ("[T]he Plaintiff was struck, allegedly so hard that his nose was broken and there was

14

blood "all over" the Plaintiff's pants and shirt. . . . The Plaintiff repeatedly refused to go to the hospital . . . . A person's right to refuse medical treatment must be balanced with the state's interest in preserving the lives and safety of its citizens. . . . [G]iven the crisis situation, the Plaintiff's serious injuries, the lack of supporting relevant case law, and the underlying policy considerations, the court finds that the Defendants did not violate the Plaintiff's Fourteenth Amendment right to refuse medical treatment."). Given Plaintiff's admitted inebriated condition due to the consumption of multiple alcoholic beverages before and after being drugged with GHB or Rohypnol, as well as having suffered a concussion, it was reasonable for trained medical personnel to detect that Plaintiff's condition warranted further observation. *See Vazquez v. Marciano*, 169 F. Supp. 2d 248, 253 (S.D.N.Y. 2001) ("Plaintiff also contends that Marciano violated his civil rights by forcing him to receive medical treatment. Plaintiff had just been in a serious automobile accident. He admits that he lost consciousness after his car hit the tree. He was also visibly inebriated, and admitted to intoxication. . . . A reasonable police officer not only could have, but would have, concluded that plaintiff could have been seriously injured in the accident and was therefore in need of medical assistance. As defendants point out, if the police had not sent plaintiff to the hospital, they no doubt would have been sued for refusing him needed medical treatment. Marciano's decision to send plaintiff to the hospital was objectively reasonable.").

Given the facts alleged this case, the undersigned concludes that it was reasonable for Defendants to administer medical treatment to Plaintiff without his consent, observe him for a limited time period, and release him later that same day. The facts in Plaintiff's case are distinguishable from the facts in *George v. Edelman* most notably because Plaintiff's mental condition was in question due to trauma to the head, a concussion, and the consumption of GHB or

15

Rohypnol in conjunction with multiple alcoholic beverages. While Plaintiff may have believed that his mental condition was sound at the time he was admitted at Parkland, numerous medical professionals did not agree. Under the United States Supreme Court and the circuit and district court case law discussed, Defendants' conduct does not rise to a violation of Plaintiff's constitutional rights given the circumstances of this case.

## **RECOMMENDATION**

For the foregoing reasons, the undersigned respectfully recommends that the District Court **OVERRULE** Plaintiff's objections and adopt the Amended Findings, Conclusions and Recommendation [D.E. 125] recommending that the District Court **GRANT** Defendants' Motion to Dismiss [D.E. 28].

**SO RECOMMENDED**, this 10th day of September, 2015.


_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

16

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service of the findings, conclusions, and recommendation. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error*. See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

17